HENRY P. SMITH, Respondent, v. ALBERT H. TRACY, Executor, etc., Appellant.

*Principal and Agent—Transfer of Stock—Warranty.*

An agent, with express authority to sell, has no implied authority to warrant, where the property is of a description not usually sold with warranty.

One employed to make a sale of bank stock is not, presumptively, empowered to warrant it in the name of his principal.

The receipt of the proceeds, by the owner of the stock, in ignorance of an unauthorized warranty by the agent, is not a ratification of the unauthorized engagement.

When a party claims, receives, and retains the property of another, knowing that it was obtained by an unauthorized use of his name, it is a ratification of the assumed agency, which evinces his assent to the original contract.

So, too, when an agent, acting within the scope of his actual authority, perpetrates a fraud for the benefit of his principal, and the latter receives the fruits of it, he thereby adopts the fraudulent acts of the agent.

But the mere receipt, by the owner, of the proceeds of his own property, is not a ratification of a collateral contract made without his authority, and to which he never knowingly assented.

APPEAL from the Supreme Court. The action was for breach of warranty on the sale of two hundred shares of stock, owned by the late Albert H. Tracy, in the Hollister Bank of Buffalo, of the nominal value of $10,000.

The cause was tried at the Erie Circuit, in June, 1865, before Mr. Justice Grover and a jury. The sale of the stock was claimed to have been made on the 9th of January, 1857. On that day Mr. Tracy received his pay. He continued to reside in Buffalo until his death, in September, 1859. The failure of the bank occurred in August, 1857, and the claim on which this suit was founded was first made in April, 1860. The Plaintiff relied upon the president and cashier of the bank as witnesses to establish their authority to make the sale, and, upon his own testimony in conjunction with theirs, to show that Hollister made certain representations, which amounted to a warranty. The Defendant claimed that the sale was made by Tracy to Hollister,. and by Hollister in his own behalf to the Plaintiff.

It appeared on the trial that, in the early part of January, 1857, Mr. Tracy, who was a director in the bank, and a shareholder to the amount of $28,000, became dissatisfied in relation to a loan of $6,000, or thereabout, which had been made to a connection of Mr. Shearman, the cashier. The president, Mr. Hollister, told him he was getting old and nervous, and perhaps he had better sell his stock. Mr. Tracy declined doing so without seeing Mr. Wilkinson; but, after seeing him, he consented to sell it, and, for that purpose, on the 9th of January he handed to Hollister his scrip, and executed written transfers in the books of the bank, leaving no blank except for the name of the purchaser. Hollister claimed that he authorized him to sell the stock at par, with interest from the date of the preceding August dividend.

Hollister sold a portion of the stock to one Townsend, a portion to the Plaintiff, and the balance he retained, purchasing it nominally for himself, on his own paper endorsed by his brother, but substantially for the benefit and with the funds of the bank.

Shearman, the cashier, had been previously endeavoring to induce the Plaintiff to become a stockholder, and on the 9th of January the latter called, at his request, and had an interview with the president and cashier, who desired him to take $10,000 of the stock. He told Shearman, in substance, that he did not know the condition of the bank, and would like to know what it was. Shearman said it was perfectly sound, that it had a surplus of $35,000 to $40,000, and that unless the sky fell it would continue to pay ten per cent. dividends. The Plaintiff told him he was unprepared to pay for $10,000 of stock at that time; that he had made up his mind to take stock, but he would only take $5,000, and would pay him for it. The cashier then mentioned to the president—who seems not to have taken part in the previous conversation—that the Plaintiff declined taking the other $5,000. Hollister then said, as the Plaintiff testifies: "We expected you would take $10,000; that Mr. Shearman talked to him about $10,000; he said he would be glad to have me take $10,000, as they depended upon it." "I then asked him what

the condition of the bank was, and told him I was unacquainted with it. He replied that the condition was good, and the investment would be a good one. I then said to Shearman that I would take $10,000, and I would pay him $5,000 then, and the balance in thirty days." He then paid them $5,000, and received a certificate of stock for that amount. He made no inquiries as to their authority, and did not see the transfers in blank, or the scrip left by Tracy with Hollister. The only writings which passed between them were the stock certificate from the bank for $5,000 and the check given for the price. After the Plaintiff took the certificate, they told him it was Tracy's stock, and that he had been induced to sell it by his embarrassment in connection with the Wabash Railroad Company. It was proved that the bank officers made the representations, believing them to be true; though it turned out, after the failure of the bank in the financial crisis of 1857, that its capital had been impaired, and the shareholders were afterward subjected to serious personal liabilities.

There was no evidence of any authority from Tracy to give a warranty, or of any knowledge on his part, then or afterward, that one had been given. It was proved that it was not usual to give a warranty on the sales of bank stocks, and the representations did not purport to be made in the name of Mr. Tracy. There was no personal communication at any time between the Plaintiff and the testator; and all that the latter did, after leaving the scrip and transfers of the $28,000 of stock, was to receive on the same day, from Hollister, the agreed price for the entire amount, embracing, among other items, the Plaintiff's check for $5,000.

The jury found for the Plaintiff, and a new trial was denied at the General Term, Davis, J., dissenting. The questions of law raised on the trial, so far as they are deemed material, are considered in the opinion.

*John Ganson* for the Appellant.
*Chauncey Tucker* for the Respondent.

PORTER, J.—We concur with the Court below in the opinion that Hollister had no authority to warrant the stock, which his principal empowered him merely to sell. The rule applicable to such a case is stated with discrimination and accuracy in our leading text-book on the law of contracts: "An agent employed to sell, without express power to warrant, cannot give a warranty which shall bind the principal, unless the sale is one which is usually attended with warranty" (1 Parsons on Contracts, 5th ed. 60). It was proved that no such custom exists in connection with the sale of bank stocks, and that the special agent, in this instance, had nothing but a naked authority to sell.

We also concur in the conclusion of the able and learned Judge, who delivered the prevailing opinion, that there was not a ratification of the contract by the principal, with knowledge of the unauthorized act of the agent. No fraud is imputed by the Plaintiff, either to the agent or the principal. He sued the executor on a contract which the testator did not make, and he took upon himself the burden of showing that another had power to make it for him. As the testator was chargeable with no negligence or wrong, and as he did nothing at any time to mislead the Plaintiff or the public, or to accredit Hollister as empowered to make general engagements in his behalf, the only mode of connecting him with the warranty was by showing that he authorized it before it was given, or that he assented to it afterward. He did neither, but lived and died in utter ignorance that such a contract had ever been made.

The recovery was obtained on the theory that the warranty was within the terms of the authority. It was sustained by a divided Court on the theory, that though the testator neither authorized nor assented to the contract, and never knew of its existence, his act, in receiving the proceeds of an authorized sale of his own property, estopped his executor from denying the collateral engagement, unlawfully entered into by another in his name. We think this view cannot be maintained. It is founded on a misapprehension of the principles, settled by a series of decisions in a class of cases to which this does not belong. When a party

claims, receives, and retains the property of another, knowing that it was obtained by an unauthorized use of his name, it is a ratification of the assumed agency, which evinces his assent to the contract or the wrong. The courts, however, have been careful, in the leading cases of that class, to note, as the precise ground of legal liability, the knowledge of the facts by the party appropriating the benefit (Murray v. Binninger, 36 N. Y. 61; Fitzhugh v. Sackett, id.; Bank of Beloit v. Beale, 34 id. 473, 475; Keeler v. Salisbury, 33 id. 653; Farmers' Loan & Trust Co. v. Walworth, 1 id. 446; Palmerston v. Huxford, 4 Denio, 166, 168). So, when a party takes the benefit of an unauthorized loan or purchase, obtained on his credit by his known servant or employee, it is held that his subsequent adoption of the transaction is equivalent to an original authority (Bolton v. Hillersden, 1 Ld. Raym. 224; Precious v. Abel, 1 Esp. 350; Rimell v. Sarpayo, 1 Carr. & Payne, 254). The cases on which the Respondent mainly relies, are those in which it has been held that when an authorized agent, *acting within the scope of his authority*, perpetrates a fraud for the benefit of his principal, and the latter receives the fruits of it, he is liable as for his own wrong (Bennett v. Judson, 21 N. Y. 238; Elwell v. Chamberlain, 31 id. 611).

These authorities rest upon the principle that when a party clothes another with authority to speak in his behalf, and endorses him to third persons as worthy of trust and confidence, those who are misled by the falsehood and fraud of the agent are entitled to impute it to the principal. The latter will not be permitted to retain the fruits of a transaction infected with fraud, whether the deceit which he seeks to turn to his profit was practised by him or by his accredited agent. In such a case he cannot separate the legal from the illegal elements of the contract, and appropriate the advantages it secures, while he rejects the corrupt instrumentalities by which they were obtained.

But when, as in the present case, there is a mere special authority to sell particular property, of a kind not usually sold with warranty, the buyer, who alleges a warranty by the agent,

must show that the engagement was one he was empowered to make in behalf of his principal. The receipt of the proceeds of the sale, in ignorance of any such undertaking, is neither an assent to the breach of duty nor an extension of the authority of the agent. The question is one as to the existence and extent of the power, and not as to a fraud practised by an agent acting within the scope of his authority.

The distinction between the different classes of cases, to which we have referred, is sharply defined in two leading decisions, both made by the same judges and at the same term of the court (Bennett v. Judson, 21 N. Y. 238; Condit v. Baldwin, id. 219, 224, 225). In Bennett v. Judson, the Defendant employed an agent to negotiate the sales of his western lands. The latter effected a sale by making representations as to the quality and location of the land, which proved to be grossly untrue. The principal, who received and retained the price, was prosecuted by the vendee for the fraud, and he insisted, by way of defence, that though he authorized his agent to negotiate the sale, he did not instruct him to cheat the purchaser; that the statements ought not to be imputed to him, for he did not make them personally, and that they could not be deemed fraudulent, for, when they were made, neither he nor the agent knew whether they were true or false. The Court held, that the principal could not claim immunity on the ground that the fraud was perpetrated through the instrumentality of his agent, and that a material misstatement, made by one who neither knows nor believes it to be true, is just as much a fraud on the party with whom he deals as if he knew it to be false.

In Condit v. Baldwin, the doctrine of involuntary ratification was sought to be extended to a case where the element of fraud was wanting, and where the principal, without knowledge of the facts, had received the fruits of a transaction in which the special agent had exceeded the limits of his actual and apparent authority. The Court held that, under such circumstances, the application of the rule recognized in the case of Bennett v. Judson would be inappropriate and unwarranted. The question arose

on a défence of usury. The Plaintiff had intrusted money to a special agent for investment. The latter lent it in the name of his principal, but transcended his power by contracting with the borrower for the payment of a bonus on the amount. The Plaintiff, in ignorance of this, received the security taken for the loan, and was met, in an action afterward brought to enforce it, with the defence that, by accepting it, she had adopted the unknown and unauthorized act of the agent. The opinion of the Court was delivered by the present Chief Judge, who aptly illustrated the distinction to which we have alluded, by a reference to the leading cases of Wilson *v.* Tumman and Bush *v.* Buckingham. "Where a landlord authorized a bailiff to distrain for rent due from his tenant, directing him not to take anything except on the demised premises, and the bailiff distrained cattle of another, supposing them to be the tenant's, beyond the boundary of the farm, and the cattle thus taken were sold, *and the landlord received the proceeds,* the landlord was held not to be liable in trover for the value of the cattle, unless it was found that he ratified the act of the bailiff with knowledge of the irregularity, or chose without inquiry to take the risk upon himself and to adopt the whole act; and it was also held that *by adopting and ratifying what he had authorized, he did not adopt and ratify the unauthorized acts of his agent.*" In Bush *v.* Buckingham (2 Vent. 83), the Plaintiff made a loan of fifty pounds at a legal rate of interest. She referred the borrower to her scrivener, who would draw the bond to secure the loan; and the scrivener, in error and against her will, included therein more than lawful interest. In a suit on the bond, the Defendant interposed the defence of usury, but it was overruled, as there was no intent on her part to take or receive more than lawful interest; and it was held that by commencing suit on the bond she did not ratify the act of her agent in providing for the payment of more than legal interest, but that she might recover the amount loaned, with lawful interest (21 N. Y. 225, 226).

The doctrine of the case of Bennett *v.* Judson, in its legitimate application to frauds perpetrated through an agent, acting within

the scope of his power, was afterward reaffirmed in Elwell v. Chamberlain (32 N. Y. 611). The rule announced in Condit v. Baldwin has since been recognized as that appropriate to a case where the question arises on the authority of the agent to enter into a collateral contract in behalf of his principal (Bell v. Day, 32 N. Y. 165, 178). There is no antagonism between the two classes of cases, and the distinction between the subjects to which they are respectively applicable, and the principles on which they rest, is overlooked by those who suppose these decisions to be inharmonious.

In the case before us it is claimed that the receipt by the testator of the proceeds of an authorized sale, is to be deemed an adoption of a contract made without his authority, and to which he never knowingly assented. Such a ruling would be subversive of well-settled legal principles, and would open the door to illimitable frauds by brokers, factors, attorneys, and others clothed with limited powers and occupying strictly fiduciary relations (Owings v. Hull, 9 Peters, 608, 629 ; Bell v. Cunningham, 3 id. 69, 76, 81 ; Brady v. Todd, 99 Eng. Com. Law, 591, 601, 605 ; Freeman v. Rosher, 66 id. 787 ; Seymour v. Wyckoff, 10 N. Y. 213). In the language of Judge Story, in the first of these cases, " no doctrine is better settled, both upon principle and authority, than this : that the ratification of an act of an agent previously unauthorized must, in order to bind the principal, be with a full knowledge of all the material facts."

The Plaintiff is chargeable with notice of the extent and limits of the power of the special agent from whom he purchased (Nixon v. Palmer, 4 Seld. 398 ; Sage v. Sherman, Lalor's Supp. 147, 152 ; Beals v. Allen, 18 Johns. 363, 366). . He knew that Hollister was not the owner of the stock he assumed to sell, and he was content to take a warranty from one who had neither actual nor apparent authority to bind his principal by such an engagement. It was a single and isolated transaction, unaided by any extrinsic fact or any antecedent relation, and upon its own merits it must stand or fall. The sole authority of Hollister was to sell the stock at par, with interest from the date of the

last dividend, and to insert the name of the purchaser in the blank left in the body of the transfer written and signed by Mr. Tracy.   The representations to the Plaintiff were not even made in the testator's name, and the purchaser, who assumed the risk of bargaining without inquiry, cannot transfer to the Defendant a loss resulting from his own neglect and incaution.

The judgment should be reversed and a new trial ordered, with costs to abide the event.

All the Judges concurring, except GROVER, J., who did not vote,

Judgment accordingly.

JOEL  TIFFANY,
State Reporter.