LEWIS WHITE AND IRA BLAKEMAN, RESPONDENTS, *v.* CHAUNCEY MILLER AND JESSE HARWOOD, TRUSTEES OF THE MUTUAL SOCIETY CALLED SHAKERS, APPELLANTS.

*Shakers — how sued — Party defendant — Misnomer — Evidence — custom of dealers — Warranty — damages for breach of — "Bristol cabbage seed," definition of — chapter 174, Laws of 1839 — chapter 373, Laws of 1849 — chapter 203, Laws of 1852.*

An action was brought by the plaintiffs, who are market gardeners at Greenbush, in the county of Rensselaer, against the defendants, as trustees of the mutual society called Shakers, to recover damages for a breach of contract made by the defendants to deliver the plaintiffs six pounds of large Bristol cabbage seed.

The defendants actually delivered six pounds of seed, which turned out to be an inferior and worthless variety, from which cause the plaintiffs lost their crop. The defense was set up by the defendants that there was a misnomer of parties defendant, in that the society should have been sued by some other name.

*Held*, that such objection should have been set up *quasi* in abatement, and in the old language of pleading, the plaintiff should have been given a better writ by an allegation of the correct name.

That the defendants were not a joint stock association, or a partnership, as no individual member had any stock or any proportionate share in the property, which on leaving he could draw out or transfer to any one else.

That they were a religious society, carrying on business, and to which the legislature had given at least three corporate qualities, viz., that these so-called trustees may hold the property, may have succession, may have the immunity of exemption from the statute of uses and trusts.

That if there was no corporation or *quasi* corporation, then, as to the world at large, these defendants must be treated as absolute owners of the property, leaving the right of the society and its members against them to be decided whenever it shall arise.

The plaintiff called for the production of the articles of association, and the defendants produced the same, but objected to their admission on the ground of want of proof of the signatures (there being some 200), *held*, that where a party to a suit, in pursuance of a notice, produces an instrument to which he is a party, and under which he claims a beneficial estate, as in this case, the other party need not call the attesting witnesses.

The admission of conversations of Miller, one of the defendants, having been objected to, *held*, that under the rulings above made, such admission was correct, as he was either the officer of a corporation speaking in regard to business intrusted to him, or the owner of the property fully authorized to act, to sell and to deal with it, or the agent with full discretion and absolute power, without accountability and holding the title.

*Held*, that in the relation these defendants held, having the power to sell on such terms as they chose, the referee was not bound to receive evidence of the custom of seed dealers, showing that such sales were not usually made with warranty, as such custom did not control them.

*Held*, as to the question of warranty, and the breach thereof, that the defendants did contract with the plaintiffs that the seed delivered and marked "large Bristol cabbage seed," were such seed, and by this term was meant to show what it would produce, not what it was produced from, and meant seed which, under proper cultivation, and if it grew at all, would produce large Bristol cabbage; and the only question to be determined was, whether the plants raised from this seed were or were not large Bristol cabbage, and the referee having found the seed was properly cultivated by the plaintiff, and that, although it produced plants, it did not produce Bristol cabbage, or only about 200 out of 100,000 plants, that the covenant or agreement was broken.

*Held*, as to the damages to which the plaintiffs were entitled, that this did not depend on whether the agreement was express or implied as long as it existed

and was broken, and the plaintiffs were entitled to recover all their damages, including gain prevented.

*Passenger* v. *Thorburn* (34 N. Y., 634); *Milburn* v. *Belloni* (39 id., 53); *Messmore* v. *N. Y. Shot and Lead Co.* (40 id., 422); *Fleet* v. *Weatherbee* (20 Wis., 392); *Walcott* v. *Mount* (36 N. J., 262) followed.

APPEAL from a judgment, entered upon the report of a referee, in favor of the plaintiffs.

In, and prior to the year 1867, the defendants were trustees of a mutual society of the people, commonly called Shakers, which was located at Niskayuna, in the town of Watervliet. Its constitution provided for the appointment of "trustees or agents," and that they should execute declarations of trust, which they had done. In 1867 and 1868, the plaintiffs were market gardeners, residing and doing business in Greenbush. In the fall of 1867, Chauncey Miller, one of the defendants, had conversations with the plaintiffs, in which he told them in substance, after inquiring about their crop of that year, that the defendants had raised that year 200 pounds of Bristol cabbage seed, and if they wanted any they must come early. At that time White told Miller they would want five or six pounds of this seed. In the month of February, 1868, the plaintiff White went to the office of the defendants at Niskayuna, and found there one Edward Hallam, who was the agent or clerk of the defendants. White then gave an order for seeds in the following manner: Hallam took a blank list of the seeds that the defendants had for sale, and White told him the quantities of each that plaintiffs desired to purchase; among the quantities ordered was six pounds of Bristol cabbage seed. Hallam wrote down the amounts ordered on the list, and promised to deliver them in a few days thereafter at the store of Isaac Aikens, in the city of Albany. Hallam gave the order to the defendant Chauncey Miller, who made out the bill for them. The seeds were sent with the bill to Isaac Aikens, and the plaintiffs received them from there by one Hall. The plaintiffs took the seed and sowed it, and at the proper time set out the plants on good land and cultivated them in a proper manner. The crop which resulted was not Bristol cabbage, which is a cabbage of a dark green color with a solid head, but was a wild cabbage running all to stalk or leaves, with the leaves largely striped with red, and proved to be nearly worthless.

The production of this wild and worthless variety of cabbage, instead of the genuine Bristol, was due to the fact that when the defendants set out their seed cabbages in 1867, they set near them several rows of another variety, known as the " Dutch Red," and the two varieties intermixed, and in consequence of such crossing, a new variety was produced, which would not head, and was worthless.

*Lyman Tremain,* for the appellants.

*Esek Cowen,* for the respondents.

LEARNED, P. J.:

The first question to be considered is, whether this action is properly brought against these defendants, even assuming that a right of action exists.

The United Society of Believers, called Shakers, residing in Watervliet, consists of a number of men and women who have, by a written agreement, as well as by their acts, united themselves into " a religious and social community." For that purpose they have adopted a covenant or constitution. Some of this touches on religious matters, some on business affairs. Each person joining the society is to sign the covenant.

After providing for " the primary administration of parental authority " at New Lebanon, it states that it has been found necessary that " superintending deacons and deaconesses should be appointed and authorized to act as trustees or agents of the temporalities of the church." It declares that " the official trustees of the church are generally known among us by the title of office deacons;" that " they are invested with the power to take the general charge and oversight of all the property, estate and interest dedicated, devoted, consecrated and given up for the benefit of the church ; to hold in trust the fee of all the lands belonging to the church," etc. It declares that it is the duty of said deacons or acting trustees " to improve, use and appropriate the said united interest for the benefit of the church ; " " to make all just and equitable defense in law," provided that all their transactions shall be for the benefit of the church, and not for their

private interest. They are to keep books of account "in which shall be entered the debit and credit account of all mercantile operations and business transactions between the church and others." They are to execute a declaration of trust, stating that they "hold all such lands, tenements, hereditaments and all the personal property in trust for the uses and purposes expressed in, and subject to, the rules," etc. This covenant is signed by some 200 persons.

The defendants are the trustees so designated. Each of them has signed a declaration reciting that he has been appointed one of the trustees of the temporalities; that he is empowered to hold, manage and improve the temporalities; to buy, sell and transact business in behalf of said church, and declaring that he holds the lands and personal property as such trustee, for the benefit of the church, and that he has no right to the same except according to the covenant.

In order that the arrangements should be legal an act was passed (1849, chap. 373), amending a former act. This declared the validity of such trusts, and that the legal authority of the trustees shall forever descend to their successors in office and trust. A further act (1852, chap. 203) defines and recognizes the existence of "a united society of," etc., declares that such trusts may be created and that the legal estates shall be vested in the trustees, and in those to whom such property is transmitted by appointment of the society.

Now it is plain, from these instruments, that the so-called trustees or agents of this society have the right to buy and sell and deal with the property. I do not mean by this that they are to appropriate the property to their private gain. But, for the purposes of the society, they, and they only, are the persons who are to buy and sell and deal with the property. The covenant, in express language, contemplates "business transactions" and "mercantile operations" between the church and others. Who is to carry these on? Not the church in its associated capacity, but the trustees, to whom the church has intrusted this business. It is even provided that "the leading authority of the church" (whatever that may be), with the trustees, shall be the official auditors. And the signature of one auditor is sufficient. So that the

trustees are not only authorized to carry on the business transactions, but one of them may audit and approve the same.

The defendants' counsel urges that private trustees are in general liable only in equity; that when such a trustee sells land with covenant of warranty he is at law liable only personally (*Duvall* v. *Craig*, 2 Wheat., 45); that executors are liable personally for contracts made by them. (*Ferrin* v. *Myrick*, 41 N. Y., 315; *Mygatt* v. *Wilcox*, 45 id., 306.)

It is not necessary to dispute this principle. But it applies to cases quite different. Neither the executor nor the ordinary trustee of a private trust is put in the ownership of property with which to buy and sell and carry on "business operations and mercantile transactions." The ordinary trustee has usually only to collect and apply income. The executor has only to close up an estate. But these trustees are to carry on the business of this society so long as it exists, and are to have perpetual succession. To show that they are not ordinary trustees, it might be asked: Who are the *cestui que trusts?* There is nothing to show that an individual member of the society has any separate right to the property or its profits. And therefore it could not be said that every member was a *cestui que trust.* And if it be suggested that the whole society are the *cestui que trusts,* then that suggestion shows that these so-called trustees are not analogous to ordinary private trustees, but that they are analogous rather to the trustees of religious corporations, or perhaps I should say, of *other* religious corporations.

It is urged however by the defendants that they are not a corporation and some cases are cited. *Appleton* v. *Water Commissioner* (2 Hill, 432), holds that the water commissioners of New York are not a corporation, but throws no light on this question. *Gardner* v. *Board of Health* (10 N. Y., 409), holds that the board of health is not a corporation, and the opinion given by Chief Justice OAKLEY, and adopted by the Court of Appeals, shows the reason and is important to the present case. He says that the board of health has no succession, no seal and no funds. It may be changed as to its members at the pleasure of the common council. Now, on the contrary, these defendants have perpetual succession, have the absolute title to very large property real and personal, and they cannot be changed, so far as appears, by anyone.

It is the ordinary statute law of this State that the property of religious corporations shall be managed by trustees. And the language of the act even authorizes the trustees to hold the property. (Act of April 5, 1813, chap. 60, § 4.)

And such trustees are, as it were, the officers of the corporation. Now, while in regard to this society of Shakers the legislature has not followed precisely the same course, yet they have done practically the same thing. They have allowed the appointment of trustees; they have given them succession; they have allowed them to hold real and personal property, and they have put a restriction on the annual income, which might thus be held. By what right would any such restriction be imposed on private trustees, or on any but a corporate, or *quasi* corporate, body?

It seems to be claimed by the defendants that they are a joint-stock association. But the answer to this is, that no individual member has any stock or proportionate share in the property of the defendants. There is nothing to show that one who leaves the society has any interest which he can draw out or transfer to some one else. Indeed, the contrary is evident. For a similar reason the society is not a partnership. It is really a "religious society," carrying on business; to which the legislature has given, at least, these qualities of a corporation, viz.: That these so-called trustees may hold the property; may have succession; may have the immunity of exemption from the statute of uses and trusts.

If it be claimed by the defendants that there was a misnomer, and that the society should have been sued by some other name; that defense should have been set up *quasi* in abatement, and the plaintiff, in the old language of pleading, should have been given a better writ, by an allegation of the correct name.

Even if it should be admitted that the defendants were not a corporation, still we should have the case of two persons authorized by law to hold and own real and personal estate, and to buy and sell and carry on business for the benefit and increase of property thus held by them. To say that, for their transactions, there could be no liability, except against them personally, excluding the property thus held, would be most unreasonable; especially when, by the fundamental doctrine of the society, neither these trustees nor any members are to own any property individually. If there

is no corporation or *quasi* corporation, then, as to the world at large, these defendants must be treated as absolute owners of the property; leaving the right of the society, and of its members against them, to be decided whenever it shall arise.

The next point urged by the defendants is, that the complaint only presents a case against the defendants as individuals. This is rather a question of pleading than a question on the merits. The case has been tried on the theory of a liability of the defendants as trustees, and proof has been given to show their character as such, and the transaction in question as one in their ordinary business as trustees. The complaint alleges that the society is carrying on the business within which the transaction in question came, and that the society made the sale. If any amendment to the complaint be necessary it should be made. But if the defendants, as trustees, are properly sued (the point previously discussed), the complaint should, at this time, be deemed sufficient.

The plaintiffs, previously to the trial, required the defendants to produce the covenant or articles of association and the declarations of trust. At the trial the plaintiffs were proceeding with parol evidence that the defendants were acting as trustees of the society, when the defendants objected. The plaintiffs then called for the production of the articles of association and the defendants produced the same, purporting to be signed by about 200 persons. The defendants objected to the admission, on the ground of want of proof of the signatures. The referee admitted the articles. The same course was followed in regard to the declarations of trust, which were produced under similar notice. The further objection was taken by the defendants in regard to these, that there were subscribing witnesses who should have been called. The decision of the referee seems to be correct. (*Betts* v. *Badger*, 12 Johns., 223.) The qualification in *Jackson* v. *Kingsley* (17 Johns., 158), does not seem to affect the present case. There it is said that when a party to a suit, in pursuance of a notice, produces an instrument to which he is a party, and under which he claims a beneficial estate. the other party need not call the attesting witness. Both of these defendants were parties to the covenant or articles. And they thereby claimed a beneficial interest in the deeds of trust, one of which was executed by each. Whether every one of the 200 sig-

natures was genuine or not, these were the articles of association of the society. And the declarations of trust were those under which the trustees held, and which declared their rights and duties to the society, in whose possession the declarations were.

The next objection is to the admissions and conversations of Miller, one of the defendants. This objection is put on the ground that he is a merely nominal party, a mere trustee, whose admissions are inadmissible against his *cestui que trust*. But in the views above stated this objection is not tenable. He is the officer of a corporation, speaking in regard to business intrusted to him. Or he is the owner of the property fully authorized to act, to sell and to deal with it. Or he is the agent with full discretion and absolute power, without accountability, and holding the title.

The next point urged is, that the referee should have received evidence of the custom of seed dealers. And the case of *Smith* v. *Tracy* (36 N. Y., 79), is cited to show that an agent authorized to sell, has no authority to warrant when the property is of a kind not usually sold with warranty. The difficulty with this objection is, that Miller and Harwood had the title to the property and full power to sell. They did not sell simply as agents without any title. Either they are like officers of a corporation to whom by the terms of the corporation an absolute power of sale is given, or they are absolute owners in respect to all others than the society. In either case, they have the power to sell on such conditions as they choose, and the custom of others does not control them.

The next important question is, whether there was any agreement on the part of the defendants to deliver "large Bristol cabbage seed," or any implied warranty, so called, in respect thereto. The facts found are in brief as follows: To Chauncey Miller, one of the defendants, was assigned the general duty of selling seeds raised by the society. In the fall of 1867, he informed the plaintiffs that the defendants had raised some Bristol cabbage seed, the same as the plaintiffs had had that year, and advised them to come for it early. In February, 1868, one of the plaintiffs went to the defendants' seed store, in Watervliet. A catalogue of seeds for sale was there shown him, and he ordered various kinds of seeds. Among these he ordered six pounds of large Bristol cabbage seed, which was one of the kinds on the catalogue. The order was

written down by one Hallam, who was the agent of the defendants to sell seeds at their store. And Hallam, as such agent, promised, at plaintiffs' request, to deliver the seeds to them at a store in Albany. No seeds were weighed out or separated from the mass at their interview. Within a few days seeds were weighed out by Hallam, as and for the seeds ordered. Among them were six pounds, marked and designated as "large Bristol cabbage." The defendant Chauncey Miller made out a bill of sale of the seeds so purchased by plaintiffs. Among the items was: "Six pounds large Bristol cabbage, thirty-six dollars." The seeds and the bill were carried by the defendant Harwood to the store in Albany designated, and were there delivered for the plaintiffs, who soon after received the same. Under the authority of *Hawkins* v. *Pemberton* (51 N. Y., 198), if the seed had been present and seen by the buyer at the time of sale, the bill of parcels would have been evidence of a warranty. Indeed the court imply that it would have justified the court in holding as matter of law that there was a warranty. So in the case of *Allen* v. *Lake* (18 Ad. & Ellis, 561), where the defendants sold the plaintiff a parcel of turnip seed, and gave them a sold note in which it was described as "Skirving's Swedes," this was held to be a warranty.

But the contract was executory. The plaintiff ordered "large Bristol cabbage seed;" the defendants subsequently delivered on that order certain seeds as large Bristol cabbage seed. Can there be any doubt that this transaction implies an agreement, that the thing thus delivered is the thing ordered? (*Reed* v. *Randall*, 29 N. Y., 368.) Either then by virtue of the bill of sale as a representation, and by the preceding and contemporaneous statements, or by the pretended performance of an executory agreement, the defendants did contract with the plaintiffs that the six pounds of seed delivered and marked "large Bristol cabbage seed," were such seed.

There is also another ground of liability, and that is that where one sells an article of his own manufacture for a particular purpose, there is an implied warranty against defects in the process of manufacture, which will render it unfit for the purpose. (*Hoe* v. *Sanborn*, 21 N. Y., 552.) The defect in the process of manufacture, in this instance, was that the defendant planted other cabbage so near to the Bristol cabbage that the pollen was carried by the

wind to the flowers of the Bristol cabbage. There was some evidence tending to show that the defendants knew of this error. At any rate it was an error which, as found by the referee, produced the bad seed. There is no dispute that the plaintiffs could not discover by inspection that these were not such seed.

Was, then, this agreement or warranty broken? The referee finds that this seed was not genuine " large Bristol cabbage seed ; " that it was raised by defendants, that it grew upon stocks of Bristol cabbage, which the defendants had planted in the vicinity of other cabbage ; that the pollen produced by flowers of such other varieties had been carried to a large portion of the flowers on the Bristol cabbage stocks which were fertilized thereby ; that in consequence thereof this seed was impure, and was not genuine Bristol cabbage seed.

The defendants claim that seed which is produced by a Bristol cabbage stock is Bristol cabbage seed. They offered to prove that, in the language of scientific men, seed grown on the stock of the Bristol cabbage, although fructified by pollen from the red cabbage, would be Bristol cabbage seed. They then offered the same proof, omitting the clause " in the language of scientific men."

And it is important to notice, in this connection, that the alleged breach of warranty is not that the seeds would not grow, but that they were not " large Bristol cabbage seed." The question, then, whether there was a breach of warranty depends on the meaning of those words, " large Bristol cabbage seed," as they were used by the parties. The defendants claim that these words mean simply the seed produced by Bristol cabbage, although the flower were fructified by a different cabbage. The plaintiffs claim that these words, as there used, mean seed which, growing, will produce Bristol cabbage ; for which result it seems to be necessary that the flower should not have been fructified by any other variety of the plant.

Now to understand the meaning of the words " large Bristol cabbage seed " we must take the circumstances into consideration. The plaintiffs were market gardeners ; known to be such to the defendants. The defendants raised seed for cultivation, and had sold to the plaintiffs the year before. If seed were raised, sold and bought, (as for instance mustard seed might be,) only for consump

tion, not for planting, then it is possible that the description of the seed might reasonably be understood to apply simply to the stock on which it was raised. But this seed was raised for the purpose of sowing; and it was bought for that purpose, as the defendants knew. Its designation was intended to show what it would produce, not what it was produced from. The description of it, then, as "large Bristol cabbage seed," meant seed which, under proper cultivation, if it grew at all, would produce large Bristol cabbage. And the question whether the agreement or warranty had been broken was to be determined by the inquiry whether the plants raised from this seed were large Bristol cabbages. The evidence offered was, therefore, properly excluded.

The referee then finds, as a fact, that this seed, having been properly cultivated by the plaintiff, although it produced plants, did not produce Bristol cabbage; that is, that out of about 100,000 plants only 200 were genuine Bristol cabbage; that the others were of no known variety, and of no value except as food for cattle. There is no doubt, then, that the covenant or agreement was broken.

The remaining question is that which gives importance to this case; and that is as to the measure of damages. The referee has followed the rule in *Passenger* v. *Thorburn* (34 N. Y., 634), and has given the plaintiff, to state it briefly, damages equal to the loss sustained by the failure of the crop.

The defendants urge that this rule is unjust. Undoubtedly the recovery is much more than the amount involved in the original transaction. But the loss has actually occurred; and the only question is, on whom shall it fall. The defendants further claim that in that case there was a warranty that the seed were Bristol cabbage seed, and would produce Bristol cabbage. But it has been already shown that in the present case there was an agreement, or as it is sometimes called, an implied warranty, that these seeds were Bristol cabbage seed, and that there was a breach of that agreement; and the question is only, what damages should be recovered for that breach. That question cannot depend on the fact whether the agreement were express or whether it were implied; as long as it existed and was broken. It would be unreasonable to say that, where a vendor produces an article and says that this is Bristol cabbage seed, one rule of damages is to be followed in case of

breach; and that another rule is to be followed where the purchaser orders Bristol cabbage seed, and the vendor in compliance with that order, sends some other seed. It seems to me, therefore, that the rule of damages in *Passenger* v. *Thorburn* applies here. To the same effect are the cases of *Milburn* v. *Belloni* (39 N. Y., 53); *Messmore* v. *N. Y. Shot and Lead Co.* (40 id., 422); *Flick* v. *Weatherbee* (20 Wis., 392); *Walcott* v. *Mount* (36 N. J., 362). It cannot be useful to examine a question which has been settled by our highest court. The rule laid down is, that " the party injured is entitled to recover all his damages, including gain prevented." The two conditions are that the damages may be such as might naturally be expected to follow from the violation of the contract; and they must be certain. (*Passenger* v. *Thorburn.*) Applying that rule, the loss of the crop would be naturally expected to follow from a delivery of impure seed; and that loss was a certain result from the cause; that is from the sowing of such seed.

The judgment appealed from should be affirmed, with costs.

Present — LEARNED, P. J., BOCKES and BOARDMAN, JJ.

Judgment affirmed, with costs.