AMELIA COOLEY ET AL., EXECUTORS, v. WILLIAM H. PERRINE.

1. A special agent, authorized to sell a horse, is not thereby authorized to warrant the quality on behalf of his principal.
2. An action to recover the price of a horse sold by a special agent, brought after it has ceased to be practicable to avoid the sale and restore the vendor and vendee to their original positions, e. g., after the horse has died in possession of the vendee, does not constitute a ratification of an unauthorized warranty of quality made by such agent.

On *certiorari* to the Common Pleas of the county of Union.

The following state of the case was agreed upon by the counsel of the respective parties :

The appellees, the plaintiffs below, brought suit against the appellant, as defendant, to recover on a note of $75, dated August 11th, 1875, made to order of Jabez B. Cooley, payable three months after date. Jabez B. Cooley died after the making of the note and before it came due. The note was part consideration on sale of a horse to defendant, Perrine, as below stated. To this action the defendant set up as defence that the horse was warranted sound at the time of the sale, and that he was not sound at that time. The appeal was tried before a jury at May Term, 1878.

The horse was in fact sold by one Joseph Woodward, to the defendant, who, at the time of the sale, told the defendant that the horse was all right. The only testimony as to the authority of Woodward in respect to this sale, was that of Woodward himself, who testified that at the time of the sale he had been in the employ of Mr. Cooley some seven or eight

Cooley v. Perrine.

years; that Mr. Cooley was engaged in carrying on the lumber
and coal business at Elizabethport, and was not a horse dealer;
that Mr. Cooley had sold only two or three horses during
the time witness was in his employ, and then only when the
horses were not suitable for his work or not needed for pres-
ent service; that witness had never before sold a horse for
Mr. Cooley; that at the time of this sale Mr. Cooley was con-
fined to his bed by sickness, which resulted in his death; that
defendant several times talked about buying a horse, and then
talked about buying another of Mr. Cooley's horses, and
finally desired to purchase the horse sold him by witness;
that from the stable witness and defendant went to Mr.
Cooley's house; that Mr. Cooley was so sick that defendant
could not see him; that witness went into Mr. Cooley's room
and told him that the defendant wanted to buy this horse;
that Mr. Cooley was not at first disposed to sell him this one;
he wanted to sell one of the other horses; he then told
witness to sell him to the defendant; the price was fixed at
$150. This was the only authority witness had to sell, and
says that he, witness, would not have sold him without Mr.
Cooley's express authority to do so; that having received this
direction to sell, he sold the horse to the defendant for the
price named; that he told the defendant the horse was all
right. But witness now says that Mr. Cooley had not directed
or authorized him to make any representations in reference
to the horse, or to warrant him. He did not tell Mr. Perrine
this at the time of the sale, nor did he tell him that he had
any authority to warrant. There was no other evidence as to
the authority of Woodward in respect to this sale.

These facts were uncontroverted.

There was no proof that either Mr. Cooley, in his lifetime,
or his executors, before the death of the horse, ever had any
knowledge of the representations made by Woodward.

The court left it to the jury to determine, from this evi-
dence, whether or not Joseph Woodward had been made, or
was acting as, such an agent as to bind his principal by his

representations or warranty. To which appellees' counsel excepted.

The court also charged " that where goods are sold for a definite price, and there is no warranty, either express or implied, and no fraud in the sale, the vendor will be entitled to recover the full price, even if the article is defective to such an extent as to diminish the value."

The court further charged that if the jury found from this evidence that Joseph Woodward was acting as the agent of Mr. Cooley, and that said Woodward has received authority from said Cooley to warrant said horse, and did warrant said horse as claimed by the defendant, and that said horse was unsound at the time of sale, and was not as represented by said Woodward, then it would be the duty of the jury to find for the defendant. To which counsel for appellees excepted.

Counsel for appellees requested the court to charge that " the servant of a private owner, intrusted to sell and deliver a horse on one particular occasion, is not, by law, authorized to bind his master by a warranty; the buyer, therefore, taking such a warranty, takes it 'at the risk of being able to prove that the servant had in fact his master's authority for giving it." The court refused so to charge, or to charge differently from charges already made. To which counsel of appellees excepted.

Exceptions were allowed accordingly.

Argued at November Term, 1878, before Justices VAN SYCKEL, KNAPP and DIXON.

For the plaintiffs in *certiorari*, Geo. F. Parrot.

For the defendant in *certiorari*, P. H. Gilhooly.

The opinion of the court was delivered by

DIXON, J. If, in this case, Woodward was anything more than a messenger, he was clearly only a *special* agent, *i. e.*, one constituted for a specific act and under an express power.

As to such an agent, it is settled that he does not bind his principal, unless his authority be strictly pursued, and those dealing with him are chargeable with notice of its extent. *Dunlap's Paley's Agency* 202 ; 2 *Kent's Com.* 620 ; *Story on Agency*, §§ 21, 126 ; 1 *Am. Lead. Cas.* 560, note.

To determine, therefore, whether what Woodward did bound his constituent, his instructions, which are the basis of his authority, must be examined ; what is embraced within their legal scope, he could do on behalf of his employer ; what is not, he could not so do.

His instructions were to sell a certain horse to a designated person at a fixed price. Herein the only term subject to any appearance of ambiguity or indefiniteness, was the direction *to sell*. But I think that also is sufficiently definite in the law to relieve the present inquiry from difficulty. A sale of a chattel is a transfer of its title by the vendor to the vendee for a price paid or promised. 1 *Parsons on Contracts* 519.

A direction to sell, therefore, nothing more appearing, would confer upon a special agent no authority beyond that of agreeing with the purchaser in regard to these component particulars.

Under certain circumstances a sale legally imports more than these particulars, and in such cases the authority under a power to sell would be correspondingly enlarged. Thus, if a sale be made by sample, it is thereby impliedly warranted that the bulk is of as good quality as the sample. Hence it has been properly held that where a broker was empowered to sell goods which were in bulk, and, by the custom of brokers, it was permissible to sell such goods by sample, and he was not restricted by his instructions as to the mode of sale, his sale by sample, and the warranty of quality therein implied, were binding upon his principal. *The Monte Allegre,* 9 *Wheat.* 616 ; *Andrews* v. *Kneeland,* 6 *Cowen* 354 ; *Schuchardt* v. *Allens,* 1 *Wall.* 354.

But in a sale of a horse, subject to the buyer's inspection, no warranty of quality is implied, and it seems a short and clear deduction of reasoning thence to conclude that in an

authority to make such a sale, no authority so to warrant is·
implied. The warranty is outside of the sale, and he who is
empowered to make the warranty must have some other power
than that to sell. Accordingly, in *Brady* v. *Todd*, 9 *C. B.*
(*N. S.*) 592, the court directly decided that the servant of a
private owner, intrusted by his master to sell and deliver a
horse on one occasion, is not, *by law*, authorized to bind his
employer by a warranty of quality, but, to do so, authority in
fact must be shown. The significant circumstances of that
case were precisely like those in this, and Chief Justice Erle·
points out the soundness, both in law and policy, of the rule
there applied.

The case of *Fenn* v. *Harrison*, 3 *T. R.* 757, (1790), which
is a leading case, illustrates the true principle. There the·
defendants directed H. to take a negotiable bill of exchange
to market and get cash for it, but stated that they would not
endorse it. It was held that H. could not make a contract to
bind the defendants to pay the bill. On a second trial, (*S.
C.*, 4 *T. R.* 177,) it appeared that the only direction to H.
was to get the bill discounted, and upon this the court decided
that H. could bind the defendants by endorsement. The
purpose of the defendants, in both cases, was to authorize a
transfer of the bill ; the law recognized two methods of doing·
this—one by mere delivery, the other by endorsement. The
instruction " to get the bill discounted," or " to get cash for·
the bill," was broad enough to include both methods of trans-
fer, but the limitation shown on the first trial, " that the de-
fendants would not endorse the bill," necessarily confined the
agent to the transfer by delivery. On both trials the court
bounded the power of the agent by his express authority ; but
when, on the second trial, it appeared that, within his au-
thority, he had chosen to transfer by endorsement, the lia-
bility legally incident thereto attached to his principals.

A remark of Ashhurst, J., in the case just cited, and two·
cases tried before Lord Ellenborough, have given rise to some
decisions and more numerous *dicta* in opposition to the views
above expressed. Ashhurst, J., said, in illustration of the·

Cooley v. Perrine.

difference between a general and a particular agent, "I take the distinction to be that if a person keeping livery stables, and having a horse to sell, directed his servant not to warrant him, and the servant did, nevertheless, warrant him, still the master would be liable on the warranty, because the servant was acting within the general scope of his authority, and the public cannot be supposed to be cognizant of any private conversation between the master and servant; but if the owner of a horse were to send a stranger to a fair, with express directions not to warrant the horse, and the latter acted contrary to the orders, the purchaser could only have recourse to the person who actually sold the horse, and the owner would not be liable on the warranty, because the servant was not acting within the scope of his employment." This remark lends some countenance to the idea, which however it does not directly assert, that an authority to sell, given even to a particular agent, embraces an authority to warrant in the absence of an express exclusion.

In *Helyear* v. *Hawke*, 5 *Esp.* 72, (1803), Lord Ellenborough said, "I think the master having intrusted the servant to sell, he is intrusted to do all he can to effectuate the sale, and if he does exceed his authority in so doing, he binds his master." As no warranty was shown in this case, it did not become necessary to apply the doctrine thus announced.

In *Alexander* v. *Gibson*, 2 *Camp.* 555, (1811,) the same learned Chief Justice declared that if the servant was authorized to sell the horse, and to receive the stipulated price, he thought he was incidentally authorized to give a warranty of soundness; that it was most usual, on the sale of horses, to require a warranty, and the agent who is employed to sell, when he warrants the horse, may fairly be presumed to be acting within the scope of his authority. In this case the plaintiff called the servant as a witness, who swore that he was expressly forbidden by his master to warrant the horse, and there was no other evidence as to his authority, yet, because the warranty by the servant was proved, the plaintiff recovered on the warranty against the master.

For these *dicta* and decisions no authority is cited.   Chief Justice Erle says, in *Brady* v. *Todd, ubi supra,* that he understands these judges to refer to a general agent employed for a principal to carry on his business of horse dealing.   Certainly if the ruling in Alexander *v.* Gibson had regard to a particular agent, it has not been followed to the extent to which it was there carried.   No other case holds that such an agent could bind his principal by a warranty expressly interdicted. But to the extent of holding that a special agent might warrant if not forbidden, these observations have formed the foundation of some judicial assertions and adjudications.

The earliest case I find in this country is *Lane* v. *Dudley,* 2 *Murph.* 119, (1812,) where Taylor, Chief Justice, citing the substance of Ashhurst's illustration, says an authority to warrant a horse is within the scope of an authority to sell. The decision itself turned on a ratification.

· In *Skinner* v. *Gunn,* 9 *Porter* 305, (1839,) it is said " an agent employed to sell a horse may warrant him to be sound, that being usually done in such cases."   The suit was on a warranty of a slave, but failed for want of proof.   *Fenn* v. *Harrison, Helyear* v. *Hawke,* and *Alexander* v. *Gibson, ubi supra,* are the only cases cited.

Following this are *Gaines* v. *McKinley,* 1 *Ala.* 446, and *Cocke* v. *Campbell,* 13 *Ala.* 286, on warranty of soundness of slaves, and *Bradford* v. *Bush,* 10 *Ala.* 386, on warranty of the age of a horse.

In *Ezell* v. *Franklin,* 2 *Sneed* 236, it was held that authority to sell a slave gave authority to warrant soundness, citing Fenn *v.* Harrison, but no case of special agency ; and in *Tice* v. *Gallup,* 2 *Hun* 446, it was decided that a special agent, authorized to sell a horse, might warrant its age and the cause of its apparent lameness, by virtue of his agency to sell, unless forbidden so to do by his principal.   The only case cited for this position is *Nelson* v. *Cowing,* 6 *Hill* 336, which however supports it by a *dictum* only.

These are the only cases I have found wherein it has been decided that an authority to a special agent to sell, embraces

an authority to warrant quality. Resting, as they all do, either directly or indirectly, on Fenn v. Harrison, Helyear v. Hawke and Alexander v. Gibson, they no longer have any foundation on authority, since these three cases, if they ever applied to a special agency, are now, it that respect, distinctly overruled by *Brady* v. *Todd*, *ubi supra ;* a decision foreshadowed by Creswell, J., when, in *Coleman* v. *Riches*, 16 *C. B.* 104, 113, (1855,) he asked counsel, citing 2 *Camp.* 555, "would you hold that to be good law at the present day?" and clearly approved as correct in principle in *Udell* v. *Atherton*, 7 *H. & N.* 170.

Nor have they any better basis on principle than on authority. Their underlying principle is said to be that the agent, being empowered to sell, is intrusted with all powers proper for effectuating the sale, and a warranty of quality is both a proper and a usual power for that purpose. If by this were meant that the agent is intrusted with all powers proper to the making of an effectual sale, its accuracy could not be questioned. Undoubtedly his authority extends to whatever is proper to be done in fixing the price, and the time and mode of payment, and the time and mode of vesting the title and delivering the chattel. All these things are incident to the sale. But if the expression mean that the agent is intrusted with all powers convenient for the purpose of inducing the purchaser to buy, even to the extent of enabling him to make collateral contracts to that end, then I think it is in violation of the settled rule that the special agent must be confined strictly to his express authority, and is in opposition to well-considered and authoritative decisions. For example, it might very much facilitate the sale if the agent could endorse the vendee's note for the purpose of raising the money to pay the price, and such an exercise of power would jeopardize the principal no more than would a sale on credit, and very much less than might a warranty of quality; and yet I imagine that a special agent could not make such an endorsement binding on his employer, for in *Gulick* v. *Grover*, 4 *Vroom* 463, the Court of Errors held that even a general

agent had no authority so to endorse, to enable his principal's debtor to borrow money to pay the debt. So in *Upton* v. *Suffolk County Mills*, 11 *Cush.* 586, it was adjudged that even a general agent for the sale of flour could not warrant that it would keep good during a voyage to California. And in *Bryant* v. *Moore*, 26 *Vt.* 84, a warranty of oxen by a special agent empowered to exchange, was held invalid against the principal. Likewise, in *Lipscomb* v. *Kitrell*, 11 *Humph.* 256, it was decided that an authority to sell a claim confers no authority to guarantee it—that such a guaranty is not a necessary incident of the sale; and a similar conclusion was reached as to bank stock, in *Smith* v. *Tracey*, 36 *N. Y.* 79.

Undoubtedly there are many cases where it has been held that a general agent to sell might warrant quality. A general agent, Mr. Russell, in his treatise on Factors and Brokers, p. 75, defines to be either, first, a person who is appointed by the principal to transact all his business of a particular kind; or, secondly, an agent who is himself engaged in a particular trade or business, and who is employed by his principal to do certain acts for him in the course of that trade or business. Such agencies extend, it is said, to whatever is fairly included among the dealings of that branch of business in which the agent is employed. But their scope arises not out of the instructions given, but out of those implied powers which the law confers, even in spite of instructions, because of which these are often called implied agencies in contra-distinction from special agencies, which are express.

Thus, in *Howard* v. *Sheward*, *L. R.*, 2 *C. P.* 148, an agent of a horse dealer bound his master to a warranty of the quality of a horse sold, although directed not to warrant. Other cases of warranty of quality by a general agent are *Hunter* v. *Jameson*, 6 *Ired.* 252; *Woodford* v. *McClenahan*, 9 *Ill.* 85; *Milburn* v. *Belloni*, 34 *Barb.* 607; *Nelson* v. *Cowing et al.*, 6 *Hill* 336.

But it is utterly inadmissible to deduce from these instances of general agency the existence of similar powers in special agents, between whom and general agents Dr. Story says it is

very important carefully to discriminate. *Story on Agency,* § 21.

Nor do I see the propriety of asserting, as a matter of law, that a warranty of quality is a usual means of effecting the sale of a chattel by a private person, *i. e.,* one not a tradesman in the line of the sale, or that it is even a usual attendant upon such a sale. Such warranties may be as various as the qualities of the objects sold, and to determine, as by a rule of law, which are usual and which not, will involve the courts in discussions where the personal experience of judges must have more influence than legal principles. In every such case the question of usage should be regarded as one of fact and not of law.

Sometimes it has been intimated that a distinction might be based upon whether the warranty by the agent were set up by a plaintiff to maintain a suit against the principal, or by a defendant to resist the principal's suit for the price, and that the attempt of the principal to collect the price, after he has learned of the warranty, is a ratification of it. On the idea that the authority does not cover the warranty, and that the purchaser is chargeable with knowledge of the authority, it is not plain how he can withstand the vendor's claim on a contract made, by alleging a contract which he knew was not made. But if there be anything at all in the distinction, it must be confined to those cases where, when the principal obtains knowledge of his agent's unauthorized warranty, the sale is *in fieri,* or can be declared void and the parties restored to their original position. What the principal does in pursuance of a bargain which he has authorized his agent to make, without knowledge that his agent has entered into an unwarranted contract, is not a ratification of such contract. *Combs* v. *Scott,* 12 *Allen* 493 ; *Smith* v. *Tracy,* 36 *N. Y.* 79 ; *Titus* v. *Phillips,* 3 *C. E. Green* 541 ; *Gulick* v. *Grover,* 4 *Vroom* 463.

And if, when he acquires knowledge, he cannot, in justice to himself, disavow the whole of his agent's contracts, he is entitled to stand upon what he authorized, and repudiate the

rest; the purchaser, who dealt with a special agent without noting the bounds of his power, must suffer rather than the innocent principal. *Bryant* v. *Moore*, 26 *Me.* 84.

These views are not at all in conflict with the class of cases which hold that the principal is responsible for the fraud or deceit of his agent, committed in the course of his employment, for his employer's benefit. *Jeffrey* v. *Bigelow*, 13 *Wend.* 518; *Sandford* v. *Handy*, 23 *Wend.* 260; *Barwick* v. *Eng. Joint Stock Bank, L. R.*, 2 *Ex.* 259; *Mackay* v. *Com. Bank of N. Brunswick, L. R.*, 5 *P. C.* 394.

Those cases are well founded upon the principle that, as every man is bound to be honest in his dealings with others, so is he bound to employ honest agents, whether they be general or special, and if in transacting his business, and within the range of their authority, they be dishonest, the consequences are legally chargeable to the employer, and not to a stranger. *Hern* v. *Nichols*, 1 *Salk.* 289.

In the present suit, I think that the unauthorized warranty, inferred from the honest statement of the agent that the horse was all right, not communicated to the vendor or his representatives until after the horse was delivered to and had died in the possession of the vendee, formed no defence to the claim for the price, and that the appellee's prayer for instructions to the jury was justified by the facts and the law, and should have been granted. Its refusal was error, for which the judgment should be reversed, with costs.

The cause may be remitted to the Common Pleas for a new trial.